FILED
2014 Mar-26  AM 10:23
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| GARY VOKETZ, for himself and on behalf of the citizens of Decatur, Alabama, and the State of Alabama, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 5:14-cv-00540-AKK |
| THE CITY OF DECATUR, ALABAMA, a municipal corporation, THE CITY COUNCIL OF DECATUR, DON KYLE, ROGER ANDERS, BILLY JACKSON, GARY HAMMON, CHARLES KIRBY, and CHUCK ARD, in both their individual and official capacities, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## SUMMARY JUDGMENT BRIEF OF DEFENDANTS

**George W. Royer, Jr.**
**LANIER FORD SHAVER & PAYNE, P.C.**
**P. O. Box 2087**
**Huntsville, AL 35804**

**James U. Blacksher**
**P.O. Box 636**
**Birmingham, AL 35201**

*Attorneys for Defendants City of Decatur, Alabama, City Council of Decatur, Don Kyle, Roger Anders, Billy Jackson, Gary Hammon, Charles Kirby, and Chuck Ard*

## TABLE OF CONTENTS

A.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B.    Undisputed Relevant Material Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

C.    A Change From the Current Five Single-Member Council Districts To
      Two Council Seats Elected At Large and Three From Single-Member
      Districts Would Violate Section 2 of the Voting Rights Act . . . . . . . . . . . 9

      1.    The Gingles Preconditions of Vote Dilution That Violate Section
            2 of the Voting Rights Act Are Present under the Council-
            Manager Election System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      2.    In the Totality of Circumstances, the Council-manager Method of
            Election Violates Section 2 of the Voting Rights Act. . . . . . . . . . . 14

      3.    A change to the 3-2 council-manager election plan would also
            deny black citizens of Decatur an equal opportunity to elect
            members of the Decatur City School Board, in violation of
            Section 2 of the Voting Rights Act. . . . . . . . . . . . . . . . . . . . . . . . . 20

D.    *Shelby County v. Holder* Does Not Make Enforceable Any Voting
      Change That Could Not Be Enforced Under Section 5 of the Voting
      Rights Act Before the Supreme Court's Decision. . . . . . . . . . . . . . . . . . .  21

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

A.  Introduction

This action was commenced on February 27, 2014 by the filing of a complaint in the Circuit Court for Morgan County, Alabama by plaintiff Gary Voketz.   The matters alleged in the complaint arose from an election held in April of 2010 in which a majority of those voting approved a council-manager form of government for the City of Decatur, Alabama.  Under Alabama state law, a council-manager form of government has two council members elected at large (one of whom is to serve as Mayor), and three council members elected from single-member districts.  *Ala Code* § 11-43A-8.  The complaint sought an order from the Circuit Court of Morgan County "declar[ing] § 11-43A-6 of the Council Manager Act of 1982 mandatory and . . . immediate implementation of the Act's provisions for the City of Decatur."

Since 1988 the City of Decatur has had a method of election for the city council which involves five single-member districts.  This method of election was adopted as a part of the settlement of a Voting Rights Act action in the case of *Dillard v. City of Decatur*, CA No. 87-T-1197-N (M.D. Ala., Nov. 13, 1987).  The City of Decatur has refused to implement the council-manager form of government because the statutorily mandated method of election for that form of government would have a retrogressive impact on black voters of Decatur and would be in violation of the Voting Rights Act.

This case has been removed from the Circuit Court for Morgan County, Alabama to this Court.  The defendants seek summary judgment in their favor on the

basis that implementation of the statutorily required method of election for the council-manager form of government would violate the Voting Rights Act. This brief is submitted in support of the motion for summary judgment of the defendants and in opposition to the plaintiff's motion for summary judgment.[1]

There exist two defenses[2] based upon the Voting Rights Act which entitle the City of Decatur defendants to summary judgment in their favor and a dismissal of the plaintiff's complaint:

1.     A change from the current mayor-council form of government with Council members elected from five single-member districts to three Council members elected from single-member districts and two Council members elected at large would violate Section 2 of the Voting Rights Act, 42 U.S.C. § 1973. "Our decision in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2." *Shelby County v. Holder*, 133 S.Ct. 2612, 2631 (2013).

2.     A change to the council-manager form of government and method of electing City officials approved in the 2010 referendum would have violated Section

---

[1] In a motion for summary judgment filed with the complaint, plaintiff seeks an order requiring the defendants "to implement each and every applicable provision of the Council-Manager Act of 1982 for the City of Decatur and its citizens." Plaintiff's Summary Judgement Brief at p. 6.

[2] A governmental entity may assert, as a defense to a lawsuit challenging a presently existing method of election, that the alternative method of election sought by the plaintiff would violate the Voting Rights Act. See *Bartlett v. Strickland*, 556 U.S. 1, 6 (2009).

5 of the Voting Rights Act of 1965 as amended, 42 U.S.C. § 1973c, and that change has not been made presently enforceable by the Supreme Court's June 25, 2013 decision in *Shelby County*. The Supreme Court's decision in *Shelby County* is prospective only in its application.

### B.   Undisputed Relevant Material Facts

1.   Prior to 1988, the City of Decatur had a mayor-council form of government under which all five council members were elected by the City's voters at large. Marks Declaration at ¶ 2. See also attachment to Stacy Gilley Declaration.

2.   Currently the City of Decatur has a mayor-council form of government with five single-member council districts that was implemented in 1988 pursuant to a consent decree entered in *Dillard v. City of Decatur*, CA No. 87-T-1197-N (M.D. Ala., Nov. 13, 1987). Marks Declaration at ¶ 3 and Exhibits 1, 2 and 3 thereto.

3.   Under the current mayor-council form of government, one of the five council members is elected from District 1, which has a black voter majority. Marks Declaration at ¶ 3; Declaration of William S. Cooper at ¶ 21.

4.   The *Dillard* consent decree required the City of Decatur to adopt an ordinance implementing the five single-member council district form of city government pursuant to Ala. Act No. 87-191, Ala. Code § 11-43-63, and provided that the court-ordered plan would remain in effect only until such ordinance was

adopted.  Marks Declaration at ¶ 4 and Exhibit 1 thereto.

5.  Accordingly, when the five single-member Council districts were redrawn by ordinance in 2004 and were precleared under § 5 of the Voting Rights Act, the *Dillard* action was dismissed.  Marks Declaration at ¶ 4 and Exhibits 2 and 3 thereto.

6.  In 2010 a majority of those voting approved a change from the five single-member district plan approved in the *Dillard* litigation to a council-manager form of government pursuant to Ala. Code § 11-43A-1, *et seq.*  Marks Declaration at ¶ 5; Declaration of Steven P. Cole  at ¶ 18.  State law requires that the city council in such a council-manager form of government be composed of two council members elected at large, one of whom serves as mayor and presiding officer, and three council members elected from single-member districts.  Ala. Code § 11-43A-8.  State law further mandates that each of the single-member districts "contain[] as nearly an equal number of people as possible."  Ala. Code § 11-43A-9. Marks Declaration at ¶ 5.

7.  The City Council adopted a three-district plan that attempted to satisfy state and federal law, but it did not contain a Council district with a black voting-age majority.  Marks Declaration at ¶ 6; Cooper Declaration at ¶ 24.

8.  The council district adopted by the City Council in connection with the three-district plan which had the largest number of black voting-age citizens had only

-4-

a 35.14% black voting age population. Cooper Declaration at ¶ 24.

9.     A 3-2 city council district plan (three single-member districts and two at-large seats) required by the 1982 Council-Manger Act cannot be drawn to contain a black voting-age majority district.  Cooper Declaration at ¶ 26, 27, 28.

10.     When the change to a council-manager form of government, the three-district plan, and related changes were submitted to the U.S. Department of Justice for preclearance under § 5 of the Voting Rights Act, the Chief of the Voting Section on December 19, 2011, sent the Mayor of the City of Decatur a request for additional information.   See Exhibit A to the complaint and Exhibit 4 to Marks Declaration.

11.     Because the additional information requested by DOJ likely would have shown that some or all of the proposed changes to the council-manager form of government would have violated the Voting Rights Act, Decatur withdrew its request for § 5 preclearance.  Marks Declaration at ¶ 8 and Exhibit 5 thereto.

12.     In connection with the withdrawal of the request for preclearance, the Decatur City Council passed Resolution No. 12-019 on January 23, 2012.  Marks Declaration at ¶ 8 and Exhibit 5 thereto.

13.     Resolution No. 12-019 provided, in pertinent part, as follows:

WHEREAS, the City Council, Mayor and City Staff with the assistance of the general public diligently sought to formulate a City of Decatur Voting District Plan under the provisions of the Council

-5-

Manager Act of 1982 (State Law) which would meet the requirements of Federal Law;

WHEREAS, in October 2011 the City submitted to the U.S. Attorney General pursuant to Section 5 of the Voting Rights Act of 1965 a proposed change of government from Mayor-Council to the Council-Manager form of government; the change in the method of election from five single-member districts to three single member districts and two seats on the Council being voted on at large, and the resulting redistricting plan; as all required by the provisions of the Council Manager Act of 1982 (State Law);

WHEREAS, in December 2011 [ ] the Voting Section of the Civil Rights Division of the Department of Justice who is responsible to review Section 5 submittals informed the City that it was unable based on the information provided to pre-clear the City's submittal for the change in form of government and related items;

WHEREAS, municipalities in the State of Alabama have only the authority granted by State Law to form a particular form of government and the City finds and determines that under the provisions of the Council Manager Act of 1982 (State Law) it is required to divide the city into three voting districts each containing as nearly an equal number of people as possible;

WHEREAS, it is mathematically impossible for the City to have three single-member voting districts with each district containing as nearly an equal number of people as possible that will not have a retrogressive impact on the Black voters of Decatur;

WHEREAS, the Council finds and determines that there is no additional information relating to the present Plan submitted or an alternative three single-member voting district plan authorized by the Council Manager Act of 1982 (State Law) which can be submitted to the U.S. Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, that will enable the Justice Department to pre-clear such Plan;

*    *    *

THEREFORE, BE IT RESOLVED by the City Council of the City of Decatur Alabama that the Mayor on behalf of the City is requested and authorized to notify the Voting Section of the Civil Rights Division of the Department of Justice that the City acknowledges its determination of December 2011; and accordingly withdraws the City's request for approval of the submitted three single-member voting district and two seats on the Council being voted on at large Plan because the city has no additional information to provide which will justify pre-clearance of the submitted Plan;

Exhibit 5 to Marks Declaration

14.     In addition to withdrawing its request for preclearance for the manager-council form of government and the method of election of that form of government, the City of Decatur submitted and obtained Section 5 preclearance of the current five single-member Council districts, redrawn with 2010 census data.  Marks Declaration at ¶ 9 and Exhibit 6 thereto.

15.     The regularly scheduled 2012 Mayor and Council elections were held under the precleared five single-member district plan and the current Decatur Mayor and City Council members were elected and hold office under that plan.  Marks Declaration at ¶ 10.

16.     The African-American community in Decatur is sufficiently large and geographically compact to constitute a voting-age majority in one district when all five Council seats are elected from single-member districts.  Cooper Declaration at

-7-

¶ 28.

17.     Current Decatur City Council District 1 has a 55.47% black voting-age majority. Cooper Declaration at ¶ 21.

18.     African Americans are politically cohesive in all Decatur elections involving their particularized interests.  Affidavit of Steven P. Cole, PhD., at ¶ 28.

19.     Voting is polarized along racial lines in the City of Decatur between blacks and whites.  Cole Affidavit at ¶ 28.

20.     The 2010 municipal election referendum proposal to adopt a council-manager form of city government was racially polarized with black voters highly cohesive in voting to reject the proposal.  Cole Affidavit at ¶¶ 18-19, 28.

21.     In the 2010 referendum on whether to adopt a council-manager form of government there was a strong association between the black percentage of registration and the percentage of voters opposing the proposed change in government.  Cole Affidavit at ¶¶ 18-19. Analyses of the returns by four different statistical methods show that "yes" was supported by less than 8% of black voters, as compared with 57-60% of non-black voters.  Id.

22.     The white majority voted in a manner so as to defeat the candidates preferred by black voters in the 2008 City Council election and runoff for District 3, the 2008 election for Decatur City School Board District 5, the 2012 election for

-8-

Decatur City School Board District 5, the 2012 election and runoff for Mayor of Decatur, and the 2012 general election for President of the United States.  Cole Affidavit at ¶¶ 20-28.

23.   All of the Decatur Council members elected at large in 1980 and 1984 were white.  Attachment to Gilley Declaration.  From the first single-member district elections in 1988 to the present, an African American has been elected to the City Council from the majority-black Council District 1. Id.

24.   The Decatur City School Board Districts from which the board members are elected are geographically identical to the districts from which the council members of the City of Decatur are elected.  Section 2 of Ala. Act No. 95-363

25.   From 1996 to the present, an African American has been elected to the Decatur City School Board from the majority-black Council District 1.  Attachment to Gilley Declaration.

C.   A Change From the Current Five Single-Member Council Districts To Two Council Seats Elected At Large and Three From Single-Member Districts Would Violate Section 2 of the Voting Rights Act

Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, reads as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on

account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

The "necessary preconditions" for establishing a violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, are set out in *Thornburg v. Gingles*, 478 U.S. 30 (1986).

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. . . . Second, the minority group must be able to show that it is politically cohesive. . . . Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed, usually to defeat the minority's preferred candidate.

478 U.S. at 50 (citations omitted).  The first precondition in the *Gingles* test requires that the minority group be sufficiently large to constitute a voting-age majority in a single-member district.  *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009).

-10-

If there is evidence satisfying these preconditions, this Court still must address the totality of circumstances.

> As both amended § 2 and its legislative history make clear, in evaluating a statutory claim of vote dilution through districting, the trial court is to consider the "totality of the circumstances" and to determine, based upon a searching practical evaluation of the past and present reality, whether the political process is equally open to minority voters. This determination is peculiarly dependent upon the facts of each case, and requires an intensely local appraisal of the design and impact of the contested electoral mechanisms.

Id. at 79 (citations and quotations omitted). A list that is "neither comprehensive nor exclusive" of typical objective factors that may assist the Court's assessment of the totality of circumstances is set out in the Senate Report accompanying the 1982 Voting Rights Act Amendments, 27, U.S. Code Cong. & Admin. News 1982, p. 205-06. They include:

> [1] the history of voting-related discrimination in the State or political subdivision; [2] the extent to which voting in the elections of the State or political subdivision is racially polarized; [3] the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; [4] the exclusion of members of the minority group from candidate slating processes; [5] the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; [6] the use of overt or subtle racial appeals in political campaigns; and [7] the extent to which members of the minority group have been elected to public office in the jurisdiction. The Report notes

also that [8] evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and [9] that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value.

478 U.S. at 44-45.  The *Gingles* standards of proof apply to claims of vote dilution under Section 2 of the Voting Rights Act in both multimember and single-member districts.  *Johnson v. De Grandy*, 512 U.S. 997, 1006 (1994) (citations omitted); accord, e.g., *Solomon v. Liberty County Com'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000).

>    1.   *The* Gingles *preconditions of vote dilution that violate Section 2 of the Voting Rights Act are present under the council-manager election system*

a. The African-American community in Decatur is sufficiently large and geographically compact to constitute a voting-age majority in one district when all five Council seats are elected from single-member districts.  Cooper Declaration at ¶ 28. City Council District 1 in the 2012 redistricting plan that was precleared under Section 5 of the Voting Rights Act has a 55.47% black voting-age majority.  Id. at ¶ 21.  The Council district adopted by the Decatur City Council in connection with the manager-council form of government which had the largest number of black voting-age citizens had black voting age population of only 35.14%.  Id. at ¶ 25.  A 3-2 plan (three single-member districts and two at-large seats) required by the 1982 Council-

Manger Act cannot be drawn to contain a black voting-age majority district. Id. at ¶¶ 26-28 .

b. African Americans are politically cohesive in all Decatur elections involving their particularized interests. Cole Affidavit at ¶ 28. The 2010 municipal election referendum proposal to adopt a council-manager form of city government was racially polarized with black voters highly cohesive in voting to reject the proposal. Id. at ¶¶ 18-19, 28.

c. Analysis of election returns show that the white majority in the City of Decatur votes sufficiently in a manner that defeats the election outcomes favored by blacks. The 2010 referendum on whether to adopt a council-manager form of government and method of election is the election most directly relevant in this action. There is a strong association between the black percentage of registration and the percentage of voters opposing the proposed change in government. Analyses of the returns by four different statistical methods show that "yes" was supported by less than 8% of black voters, as compared with 57-60% of non-black voters. Cole Affidavit at ¶¶ 18-19. As Dr. Cole observed in his Affidavit: "Overall, this was a racially polarized contest since black voters considered alone would have defeated the proposal to adopt a council-manager form of government, while non-black voters alone would have passed the measure. The black-preferred choice lost." Id. at ¶ 18.

-13-

The white majority has also voted in a manner so as to defeat the candidates preferred by black voters in the 2008 City Council election and runoff for District 3, the 2008 election for Decatur City School Board District 5, the 2012 election for Decatur City School Board District 5, the 2012 election and runoff for Mayor of Decatur, and the 2012 general election for President of the United States.  Id. at  ¶¶ 20-28.

Thus, there is indisputable evidence of racially polarized voting in Decatur "that extends over a period of time," which the Supreme Court has said is "a key element of a vote dilution claim."  *Gingles*, 478 U.S. at 57, 55 (citations omitted).  The 3-2 council-manager method of election would meet all the three of the *Gingles* preconditions for finding a violation of Section 2 of the Voting Rights Act.

    2.    *In the totality of circumstances, the council-manager method of election violates Section 2 of the Voting Rights Act.*

Most of the objective factors set out in the Senate Report to the 1982 Voting Rights Amendments that this Court may use to assess the totality of circumstances are present in this case.  See *Gingles*, 478 U.S. at 45.

    a. The long history of *de jure* voting-related discrimination in Alabama has been recounted in many judicial decisions.  E.g., *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); *Bolden v. City of Mobile*, 423 F. Supp 384 (S.D. Ala. 1976), *aff'd*, 571 F.2d 238 (5th Cir. 1978), *rev'd* and *remanded*, 446 U.S. 55 (1980), *reaff'd on remand*,

-14-

542 F.Supp 1050 (S.D. Ala. 1982); *Hunter v. Underwood*, 471 U.S. 222 (1985);

*Dillard v. Crenshaw County*, 640 F.Supp. 1347, 649 F.Supp. 289 (M.D. Ala. 1986);

*United States v. Alabama*, 252 F.Supp. 95 (M.D. Ala. 1966) (three-judge court). This

history of discrimination is directly relevant to the instant action, because Decatur's

current mayor-council form of government, with five Council members elected from

single-member districts, was established in the 1987 *Dillard* consent decree as a

remedy for the previous at-large election system's violation of Section 2 of the Voting

Rights Act.  See *Dillard v. Crenshaw County*, supra.  The racially polarized voting

and other vote-dilution factors set out above that supported the *Dillard* court's

finding of a Section 2 violation still exist in Decatur today.  In these circumstances,

it would be unlawful under the Voting Rights Act for Decatur to return to at-large

election of two Council members and three single-member Council districts

controlled by white voter majorities.

      b.  The substantial extent to which voting in the elections of Decatur is

racially polarized is described above and in the Affidavit of Dr. Steven P. Cole at ¶¶

20-28.

      c.  The majority-vote and resulting runoff requirements for election to

Decatur City Council enhance the opportunity for diluting the votes of minorities.

      d.  African Americans in Decatur bear the effects of past discrimination

in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process. Some of these socio-economic disparities are summarized in the Declaration of William S. Cooper:

(a) Education

• Of persons 25 years of age and over in Decatur, 29.1% of Blacks have not finished high school. By contrast, just 11.7 % of their White counterparts are without a high school diploma.

• At the other end of the educational scale, for ages 25 and over, 6.1% of Blacks have a bachelor's degree or higher – less than one-fourth of the 28.3% rate achieved by Whites.

(b) Housing

• Nearly two-thirds of Black households (63.4%) rent their residences compared to a rental rate of about one-fourth (25.5%) for White households.

(c) Income

• Nearly one-fifth of Black households (18.5%) have annual incomes of less than $10,000. By contrast, about one in 16 (6.4%) of White households have incomes below $10,000.

• Black median household income is $21,938 – less than half of the $52,725 median income of White households.

• Black family households exhibit an even greater median income disparity vis-à-vis White family households – $27,119 for Black median family household income compared to $71,628 for White family households.

• Blacks in the city experience a poverty rate that is about three

times the poverty rate for Whites – 32.4% of Blacks live below the poverty line, versus 10.1% of Whites. In addition, nearly half of Black children (49.7%) live in poverty compared to about one in 6 White children (16.1%)

• Reflecting the high Black poverty rate, about four times as many Black households rely on food stamps compared to White households – 38.4% of Black households participate in the Supplemental Nutrition Assistance Program (SNAP) compared to 9.6% of White households.

(d) Employment

• The $15,952 median earnings level of Blacks working full-time year round is barely half the $29,589 annual median earnings garnered by Whites in Decatur.

• The Black unemployment rate (for the working age population ages 16-64 – expressed as a percent of the civilian labor force) is nearly triple the rate for Whites. At the time of the survey, 21.5% of working-age Blacks were unemployed, compared to a 7.8% rate for Whites.

• Just 10.9% of Blacks in Decatur are employed in management or professional occupations compared to 38.6% of Whites.

(e) Health

• More than half of Blacks over the age of 65 (56.7%) are disabled, compared to about one-third of Whites (34.2%) in this age category.

• Nearly one-third (30.8%) of working age Blacks lack health insurance, compared to 14.8% of their White counterparts. (This figure antedates implementation of the Affordable Care Act.)

Cooper Declaration at ¶ 20 (citations omitted).

e. The "extent to which members of the minority group have been elected to public office in the jurisdiction," 478 U.S. at 45, is the last of the seven primary factors in the 1982 Senate Report. In living memory, no African American ever has been elected to Mayor or any other at-large position in the City of Decatur or to a seat elected from a single-member district that did not have a black voter majority. As shown in the attachment to the Declaration of Stacy Gilley, all of the Decatur Council members elected at large in 1980 and 1984 were white. From the first single-member district elections in 1988 to the present, an African American has been elected in the majority-black Council District 1 to both the City Council and to the School Board. Id.; see also Cole Affidavit at ¶ 4.

f. In addition, the policy underlying Decatur's use of the council-manager system is tenuous. See 478 U.S. at 45. Contrary to the circumstances in *Solomon v. Liberty County Com'rs*, 221 F.3d 1218 (11th Cir. 2000), where both black and white voters "voted overwhelmingly against single-member districts," id. at 1223, the black voters in Decatur were overwhelmingly opposed to the change in government and method of election.

All the evidence is overwhelming that, considering the totality of circumstances, using "a searching practical evaluation of past and present reality," *Gingles*, 478 U.S. at 79 (citation and quotation omitted), the election system required

-18-

by the 1982 Council-Manager Act would violate Section 2 of the Voting Rights Act in the City of Decatur.  A case close on point is *St. Bernard Citizens For Better Government v. St. Bernard Parish School Bd.*, __ F. Supp.2d __, 2002 WL 2022589 (E.D. La., Aug. 26, 2002), where a change in the method of electing a school board from eleven members all elected from single-member districts to seven members elected from five single-member districts and two members elected at large (a 5-2 plan) was found to violate Section 2 of the Voting Rights Act.  The change was enacted by a petition and referendum, just as was the case in the instant action.  2002 WL 2022589 at *1.  An expert demographer demonstrated that one of the eleven single-member districts could be drawn with a black voting-age majority, while none was possible with only five districts.  Id. at *4.  The *St. Bernard* case was complicated by the change in size of board seats, id. at *5, which is not a factor in the instant case, where the size of the Decatur City Council would remain at five under the manager-council statute.[3]  Even so, using "the appropriate focus . . . on elections in which a minority group member is a candidate," and several exogenous elections, id. at *6, the court applied the *Gingles* preconditions and factors bearing on the totality of circumstances to declare "the 5-2 plan invalid as a violation of § 2 of the Voting

---

[3] "Except as hereinafter provided, the council shall have five members. One member shall be the mayor, elected by the voters at large, to preside over the deliberations of the council."  Ala. Code § 11-43A-8.

Rights Act." Id. at *10.  The same conclusion is compelled in the instant case.  See also *United States v. City of Euclid*, 580 F. Supp.2d 584 (N.D. Ohio 2008) (combination of single-member and at-large city council seats violated Section 2 of the Voting Rights Act); *United States v. Osceola County*, 474 F. Supp.2d 1254 (M.D. Fla. 2006) (5-2 single-member district and at-large plan not an adequate remedy for Section 2 violation).

3.    *A change to the 3-2 council-manager election plan would also deny black citizens of Decatur an equal opportunity to elect members of the Decatur City School Board, in violation of Section 2 of the Voting Rights Act.*

The method of electing members of the Decatur City Board of Education is specified by Section 2 of Ala. Act No. 95-363:

The school districts from which the board members are to be elected shall be geographically identical to the districts from which the council members of the City of Decatur are elected. In the event the boundaries of a city council district should be changed for any reason, the boundaries of the corresponding school board district within the City of Decatur shall automatically change accordingly without the necessity of further action by the Legislature.

If the request for relief in the complaint were granted, for the same reasons that it would violate black citizens' rights under Section 2 of the Voting Rights Act to elect members of the Decatur City Council, it would also violate their Section 2 rights to elect members of the School Board.  The double adverse impact of implementing

-20-

the council-manager form of government makes the change all the more "tenuous" within the meaning of *Gingles* and the 1982 Senate Report.

   D.   *Shelby County v. Holder* Does Not Make Enforceable Any Voting Change That Could Not Be Enforced Under Section 5 of the Voting Rights Act Before the Supreme Court's Decision

An additional reason exists why the change to a council-manager form of government would be in violation of the Voting Rights Act.  The City of Decatur in January 2012 withdrew its submission to the U.S. Department of Justice of the council-manager form of government and statutorily mandated method of election because it would have caused retrogression in the ability of its black citizens to elect candidates of their choice and thus would have violated Section 5 of the Voting Rights Act. Marks Declaration at ¶ 8 and Exhibit 5 thereto.  Without Section 5 preclearance, the council-manager form of government could not lawfully be enforced.  42 U.S.C. § 1973c.  Contrary to the allegations of the complaint in this action, the Supreme Court's *Shelby County* decision did not repeal or render nugatory the prohibition in Section 5 against enforcing the 2010 change to a council-manager government.

The holding in *Shelby County* on its face clearly applies prospectively.  It does not declare Section 5 unconstitutional; it still "forbids voting changes with 'any discriminatory purpose' as well as voting changes that diminish the ability of citizens,

on account of race, color, or language minority status, 'to elect their preferred candidates of choice.'" 133 S.Ct. at 2621 (quoting 42 U.S.C. §§ 1973c(b)-(d)). Rather, *Shelby County* holds only that the coverage formula in Section 4(b), 42 U.S.C. § 1973b(b), "*can no longer be used* as a basis for subjecting jurisdictions to preclearance." 133 S.Ct. at 2631.  (emphasis added).

The Court's holding carefully avoids suggesting that every violation of Section 5 that occurred after passage of the 2006 Voting Rights Act now is a nullity.  Section 5 still is binding law, and it says any voting change that a covered state or political subdivision "shall enact or seek to administer" may not be enforced unless the District Court for the District of Columbia issues a declaratory judgment that the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c(a).  Alternatively, the change may be enforced if it is submitted to the Attorney General and he or she does not make a timely objection.  Id.

The voting change at issue in this action was "enacted" by petition and referendum in 2010.  The City of Decatur government did not "seek to administer" the change as provided by Alabama law in the 2012 election, because it had not obtained the requisite declaratory judgment from the District of Columbia District Court and had withdrawn its submission to the Attorney General, conceding that the

-22-

change would violate Section 5.[4]  This was functionally equivalent to a formal objection to preclearance; as a matter of federal law, the council-manager form of government and method of election were unenforceable.  The clear intent of the Supreme Court is that voting changes rendered unenforceable by Section 5 before it's *Shelby County* decision remain unenforceable to this day.  Only voting changes enacted or administered by a previously covered state or political subdivision after June 25, 2013, may be enforced without complying with Section 5 of the Voting Rights Act.

Undersigned counsel are aware of no appellate court decision that has addressed the question presented here, and only two district court decisions that have done so.  *Hall v. Louisiana*, __ F. Supp.2d __, 2013 WL 5405656 (M.D. La., Sept. 27, 2013), and *Bird v. Sumter County Bd. of Educ.*, __ F. Supp.2d __, 2013 WL 5797653 (M.D. Ga., Oct. 28, 2013), both held that *Shelby County* applies retroactively to cases pending when the Supreme Court handed down its decision on June 25, 2006.  Both decisions dismissed the plaintiffs' requests for injunctions

---

[4]  In his letter of December 19, 2011 to the Mayor of the City of Decatur requesting additional information regarding the change in the method of election of the city council, the Chief of the Voting Section of the Department of Justice stated: "Our analysis indicates that the information sent is insufficient to enable us to determine that the proposed changes do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group, as required under Section 5."

-23-

against continued enforcement of voting changes, including, in *Hall v. Louisiana*, changes antedating passage of the 2006 Voting Rights Act. Both district courts acknowledged that *Shelby County* did not affect claims or defenses based on Section 2 of the Voting Rights Act. *Hall*, 2013 WL 5405656 at *4; *Bird*, 2013 WL 5797653 at *3 (holding that the defendant school board's allegation that a 2011 redistricting plan violated Section 2 was not properly before the court).

The retroactivity rulings in *Hall* and *Bird* ought not be followed in the instant action, because they misapply the controlling Eleventh Circuit and Supreme Court precedents and are based on superficial readings of the *Shelby County* decision. Both district court cases incorrectly interpreted *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86 (1993), as having completely overruled the balancing test in *Chevron Oil Co. v. Huson*, 404 U.S. 97 (1971), for determining whether to apply a Supreme Court decision prospectively or retrospectively. That interpretation conflicts with the Eleventh Circuit's *en banc* decision in *Glazner v. Glazner*, 347 F.3d 1212 (11th Cir. 2003), which controls the issue in the instant action, and which held that in *Harper* "the Court has clearly retained the possibility of pure prospectivity and, we believe, has also retained the *Chevron Oil* test, albeit in a modified form, as the governing analysis for such determinations in civil cases." 347 F.3d at 1216-17 (citing *Harper*, 509 U.S. at 94-99).

-24-

The Eleventh Circuit in *Glazner* distinguished in the relevant Supreme Court precedents between "pure prospectivity, which occurs where a court gives a newly announced rule no retroactive effect, and modified prospectivity, which occurs where a court applies a newly announced rule retroactively on a case by case basis." 347 F.3d at 1217 (citations omitted). The Supreme Court has rejected both pure prospectivity and modified prospectivity "for newly announced rules governing criminal prosecutions . . . ." Id. But, *Glazner* says, *Harper* and *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529 (1991), rejected only modified prospectivity in civil cases, "they did not alter the underlying validity of pure prospectivity or the *Chevron Oil* test." 347 F.3d at 1217-18. Rather, in *Harper*, "the majority merely reiterated the rule that once a court retroactively applies a newly announced rule in one case, the rule must be applied retroactively to all pending cases." Id. at 1218 (citing 507 U.S. at 97).

The question, then, is whether the Supreme Court's new rule in *Shelby County* that the coverage formula in Section 4(b) of the Voting Rights Act "can no longer be used as a basis for subjecting jurisdictions to preclearance," 133 S.Ct. at 2631, was applied retrospectively to the party before it. If the Court did not apply its ruling retrospectively to Shelby County, Alabama, it cannot be applied retrospectively to parties in cases pending on June 25, 2013, much less to parties, like plaintiff Voketz,

who commenced their civil actions after *Shelby County v. Holder* was decided.  A

careful reading of Chief Justice Roberts' *Shelby County* majority opinion shows on

its face that the new Section 4(b) rule was not applied retroactively to Shelby County,

Alabama, and that interpretation is confirmed by the *Chevron* test.

Justice Roberts' opinion acknowledges that "the Attorney General has recently

objected to voting changes proposed from within the county."  133 S.Ct. at 2621

(citing Joint Appendix, 2012 WL 6952117, at pp. 87-92).  This was a reference to the

objection to annexations and a 2008 redistricting plan submitted to the Attorney

General by the City of Calera.  Nowhere does the majority opinion say or suggest that

the Attorney General's previous objection now is invalid and that Calera is now free

to enforce those voting changes that previously were unenforceable under Section 5

of the Voting Rights Act.  To the contrary, the opinion throughout speaks to the

question whether the Section 4(b) coverage formula should be declared

unconstitutional[5] "now," that is, "[n]early 50 years" after the Court held in 1966 that

it was constitutional.  133 S.Ct. at 2624-25 (citing *South Carolina v. Katzenbach*, 383

U.S. 301 (1966)).  "The question is whether the Act's extraordinary measures,

---

[5]  The Court did not hold that Congress had exceeded its enforcement powers under § 2 of
the Fifteenth Amendment, nor that Section 4(b) of the Voting Rights Act violates any express
provision of the Constitution.  Rather, it held that Section 4(b) violates "our historic tradition that
all the States enjoy equal sovereignty." 133 S.Ct. at 2621 (quoting *Northwest Austin Municipal Util.
Dist. No. One v. Holder*, 557 U.S. 193, 202 (2009)).

including its disparate treatment of the States, **continue** to satisfy constitutional requirements." 133 S.Ct. at 2619 (bold emphasis added). The majority opinion acknowledges that all of Congress' previous extensions of the Section 4(b) coverage formula were upheld against constitutional challenge. 133 S.Ct. at 2620-21. It talks in terms of Section 4(b)'s "continued constitutionality" in 2009 when *Northwest Austin* "expressed serious doubts." Id. at 2621, 2627. It questions whether the coverage formula imposes "current burdens" that can be justified by "current needs." Id. at 2627. It says "today" the nation is no longer divided along racial lines. Id. at 2628. Finally, it says: "Congress could have updated the coverage formula [in 2009], but did not do so. Its failure to act leaves us **today** with no choice but to declare § 4(b) unconstitutional. The formula in that section can **no longer** be used as a basis for subjecting jurisdictions to preclearance." Id. at 2631 (bold emphases added). The majority's repeated reliance on the present and the future leaves no room for any suggestion that Shelby County's past voting changes that could not be enforced under Section 5 of the Voting Rights Act now may be implemented. In short, *Shelby County v. Holder* does not hold that the Section 4(b) coverage formula was unconstitutional before June 25, 2013.

Application of the three-part *Chevron* test yields the same conclusion that the *Shelby County* decision is to be applied prospectively. The first *Chevron* prong is

clearly satisfied.  There is no doubt that by striking down Section 4(b) the Court announced a new rule of constitutional law, overruling past precedents cited in the majority opinion and "deciding an issue of first impression the resolution of which was not clearly foreshadowed."  *Glazner*, 347 F.3d at 1220 (citation omitted).

*Glazner* noted that the *Harper* and *Beam* decisions of the Supreme Court modified the three prong *Chevron* test for determining pure prospectivity.  *Glazner*, 347 F.3d at 1219.  The modifications are to the second and third *Chevron* prongs and require that those prongs now be analyzed under an objective standard, rather than "relying on the equities of a particular case."  Id.  As the Court in *Glazner* stated: "[W]e recognize that the second and third prongs of *Chevron* are properly viewed today as objective inquiries that examine the impact of a newly announced rule on the entire class of persons potentially affected by the new rule, rather than the impact on any specific litigant."  Id.

The modification to an objective standard under the second and third *Chevron* prongs operates to make both of those prongs weigh heavily in favor of prospective application of *Shelby County*, particularly given the nature of the Voting Rights Act and the interests it is intended to vindicate.  Under the second *Chevron* prong, retrospective operation of the *Shelby County* decision would retard operation of the Voting Rights Act, because it would allow previously covered jurisdictions to

-28-

implement past changes in their voting practices that would have had the purpose or effect of diminishing the ability of protected minorities to elect candidates of their choice. This retrospective operation of *Shelby County* would undermine the fundamental purpose of Section 5 of the Voting Rights Act and the Fifteenth Amendment. "The Act has proved immensely successful at redressing racial discrimination and integrating the voting process." 133 S.Ct. at 2626. Retroactive application of *Shelby County* would undo that success.

With regard to the third *Chevron* prong, retroactively releasing Alabama and other covered jurisdictions from their obligation to comply with Section 5 of the Voting Rights Act would operate as an across-the-board inequitable harm to numerous members of racial and language minority groups who have relied on its preclearance requirement to protect their equal voting rights. *Glazner*, 347 F.3d at 1220. If Alabama or its political subdivisions began implementing prior changes that were unenforceable absent preclearance before *Shelby County* was decided, it would force African Americans to undertake the legally more difficult, expensive, and time-consuming burden of prosecuting new civil actions under Section 2 of the Voting Rights Act or the Constitution to challenge previously enacted racially based impediments to voting that were clearly illegal, litigation that Congress concluded was "inadequate in the covered jurisdictions to protect the rights of minority voters."

-29-

133 S.Ct. at 2622.

The City of Decatur cannot lawfully implement today the 2010 changes to its form of government and method of election that were unenforceable under Section 5 of the Voting Rights Act prior to the Supreme Court's *Shelby County v. Holder* decision.   As a consequence, the plaintiff cannot obtain the relief sought by him in his complaint in this case.

## CONCLUSION

Defendants are entitled to summary judgment in their favor as a matter of law. A change to the council-manger form of government and method of electing the Decatur City Council would violate Sections 2 and 5 of the Voting Rights Act.  The plaintiff's complaint is due to be dismissed with prejudice.

s/ George W. Royer, Jr.
George W. Royer, Jr.

LANIER FORD SHAVER & PAYNE, P.C.
P. O. Box 2087
2101 West Clinton Avenue,  Suite 102 (35805)
Huntsville, AL 35804
Phone: 256-535-1100 / Fax: 256-533-9322
E-mail: gwr@lfsp.com

-30-

s/ James U. Blacksher
James U. Blacksher

P.O. Box 636
Birmingham, AL 35201
Phone: 205-591-7238 / Fax: 866-845-4395
jblacksher@ns.sympatico.ca

Attorneys for Defendants City of Decatur, Alabama,
City Council of Decatur, Don Kyle, Roger Anders,
Billy Jackson, Gary Hammon, Charles Kirby, and
Chuck Ard

<u>CERTIFICATE OF SERVICE</u>

I certify that I have filed the foregoing with the Clerk of the Court using the ECF System, which will send notification of such filing to those parties of record who are registered for electronic filing, and further certify that those parties of record who are not registered for electronic filing have been served by mail by depositing a copy of the same in the United States mail, first class postage prepaid and properly addressed to them as follows:

Carl A. Cole, III
Russ Prickett
The Cole Law Firm
P.O. Box 2064
Decatur, Alabama 35602

on this the 26th day of March, 2014.

s/ George W. Royer, Jr.
George W. Royer, Jr.

-32-