FILED
2018 Nov-15 PM 03:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-11941
_____

D.C. Docket No. 5:14-cv-00540-AKK

GARY VOKETZ,
for himself and on behalf of the citizens of Decatur, Alabama, and the State of Alabama,

                      Plaintiff - Appellant,

versus

DECATUR, ALABAMA, CITY OF,
the; a municipal corporation,
CITY COUNCIL OF DECATUR, THE,
DON KYLE,
ROGER ANDERS,
BILLY JACKSON, et al.,

                      Defendants - Appellees,

AL ROBINSON,
DORIS A. BAKER,
DR. SAMUEL T. KING,
ANNIE R. PRIEST,

                Intervenors Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(September 13, 2018)

Before TJOFLAT and JULIE CARNES, Circuit Judges, and BLOOM,[*] District Judge.

JULIE CARNES, Circuit Judge:

  In 2010, Decatur residents passed a referendum to change Decatur's form of government, including how the city council was elected. City officials, however, decided not to implement the referendum because they believed doing so would violate § 5 of the Voting Rights Act. Gary Voketz filed this lawsuit in 2014 to compel Decatur to implement the referendum. The City and its current councilmembers again contend that they cannot do so because it would violate § 5.

  After initially denying the defendants' motion for summary judgment based on § 5, the district court reversed itself and granted summary judgment. We disagree with the court's second decision. By striking down § 4(b)'s coverage formula that defined the jurisdictions to which § 5 applies, the Supreme Court's

---

[*] Honorable Beth Bloom, United States District Judge for the Southern District of Florida, sitting by designation.

decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), rendered § 5 inapplicable to Decatur. Thus, § 5 does not prohibit Decatur from implementing the referendum and reforming its government now, in 2018. Accordingly, we **REVERSE** the district court.

## I. BACKGROUND

### A. Factual Background

In 2009, Voketz, a Decatur resident, began circulating a petition for a referendum to change the form of government of Decatur, Alabama. Decatur had redrawn its voting districts in 2004 to comply with the Voting Rights Act. By doing so, the City freed itself from a 1988 consent decree that governed its electoral procedures. Given this new freedom, Voketz sought a referendum to change Decatur's form of government from mayor-council to council-manager.

At the time Voketz began circulating his petition, Decatur's mayor-council government was led by a mayor elected at large and five city councilmembers elected from single-member voting districts. One of the five councilmember voting districts had a black voting-age majority.

Voketz's referendum to change to a council-manager government would retain the five-member city council but would modify how those members were elected. Instead of all members being elected through single-member voting

districts, two members would be elected at large—one of whom would serve as mayor. Ala. Code § 11-43A-8. The remaining three councilmembers would be elected by single-member districts. *Id.* § 11-43A-9.

Voketz's efforts were successful, and, in 2010, the referendum passed, and the residents of Decatur elected to change to a council-manager form of government.

Drawing new single-member districts that satisfied both federal and state law, however, put Decatur between a rock and a hard place. Section 5 of the Voting Rights Act required that Decatur, as a covered jurisdiction, preclear any changes to its voting laws either with the Department of Justice or by obtaining a declaratory judgment from the United States District Court for the District of Columbia. 52 U.S.C. § 10304(a). Without preclearance, § 5 stipulated that covered jurisdictions like Decatur could not enact or administer any laws that would have a retrogressive effect on minority voting power—meaning that a minority population's ability to elect its preferred candidate could not be decreased. *Id.*; *see also Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 478 (1997).

Meanwhile, Alabama law required that Decatur's voting districts "contain[ ] as nearly an equal number of people as possible." Ala. Code § 11-43A-9. But, because of the overall population numbers and geographic spread of Decatur's

4

black voting-age population, the only feasible way (according to the City) to comply with § 5 and preserve a majority-black voting district was to draw districts that were greatly unequal in population.

The tension between preserving a majority-black voting district and equalizing population between the districts proved unworkable. Of the six potential district maps evaluated by the City, five had maximum population deviations between districts of 24.09% or more. To comply with Alabama's equal population requirement, Decatur adopted the sixth plan that had a population deviation of only 3.62%. The sixth map, however, required the removal of the majority-black voting district because, under that map, the district would have only a 34.96% black voting-age population.

Nevertheless, Decatur submitted the sixth plan to the Department of Justice for preclearance under § 5 in October 2011. In December 2011, DOJ sent Decatur a "more information request." The request informed Decatur that "the information sent is insufficient to enable [DOJ] to determine" whether the new plan complied with § 5, and it asked for further documentation and data on voting behavior and election results. Faced with this request, Decatur determined that the new information would likely demonstrate that the redistricting plan violated the Voting Rights Act.

So, in January 2012, the city council released a resolution declaring that "it is mathematically impossible for the City to have three single-member voting districts with each district containing as nearly an equal number of people as possible that will not have a retrogressive impact on the Black voters of Decatur." And, instead of providing DOJ with additional information, the City withdrew the council-manager districting plan and created a new plan (redrawn to accommodate the 2010 census) under the original government structure with five single-member voting districts that preserved the majority-black voting district.  DOJ precleared this new plan, and regularly scheduled elections took place in 2012.

### B.   Procedural History

In February 2014, Voketz filed this lawsuit in Alabama state court against the City of Decatur and the city council—Don Kyle, Roger Anders, Billy Jackson, Charles Kirby, and Charles Ard—(collectively, "Defendants") seeking declaratory and injunctive relief to compel Decatur to implement the 2010 referendum and reform Decatur's governmental structure.  Defendants removed to federal court and moved for summary judgment on the grounds that "[a] change to the council-manager form of government and method of electing City officials approved in the 2010 referendum would violate Section 5 of the Voting Rights Act."  The district court denied the motion and concluded that the Supreme Court's holding in *Shelby*

*County v. Holder*, 570 U.S. 529 (2013)—which freed Decatur of any obligation to comply with § 5—applied retroactively, so § 5 posed no barrier to implementation of the referendum.

After the Supreme Court decided *Harris v. Arizona Independent Redistricting Commission*, _ U.S. _, 136 S. Ct. 1301 (2016), Defendants moved for reconsideration. The district court reversed its initial order and granted summary judgment to Defendants. Contrary to its initial decision, the court concluded that *Harris* demonstrated that *Shelby County* was not retroactive and that Defendants thereby had a valid § 5 defense. Voketz filed a timely appeal under 28 U.S.C. § 1291.

## II.   <u>STANDARD OF REVIEW</u>

We review a district court's grant of summary judgment *de novo*, viewing all factual inferences in the light most favorable to the nonmoving party. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007). To grant summary judgment, the moving party must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.   DISCUSSION

At issue in this appeal is whether § 5 prohibits Defendants from implementing the 2010 referendum now in 2018.  To resolve this, we first examine the Voting Rights Act and the Supreme Court's decision in *Shelby County*.  Section 5 of the Act prohibits only those jurisdictions covered under § 4(b) from changing their voting procedures without first preclearing the changes.  *Shelby County* struck down § 4(b)'s coverage formula as unconstitutional.  As a result, there are no covered jurisdictions for § 5 to apply to, so § 5 is functionally unenforceable.

From this, it logically follows that § 5 does not restrict Decatur's post-*Shelby County* implementation of the 2010 referendum.  Because Voketz seeks only to compel Defendants to implement the referendum going forward, § 5 cannot prohibit it because § 5 no longer applies to Decatur.  And, because Voketz seeks only prospective relief, *Shelby County*'s retroactivity is not at issue.

### A.   The Voting Rights Act and *Shelby County*

We begin by examining sections 4 and 5 of the Voting Rights Act, the interaction between the two, and how *Shelby County*'s invalidation of § 4(b)'s coverage formula impacted § 5.

1.  Sections 4 and 5 of the Voting Rights Act

Sections 4 and 5 of the Voting Rights Act of 1965—as they existed in the most recent reauthorization of the Act in 2006[1]—together prevented covered political jurisdictions from enacting or enforcing laws that harmed minority voting rights in certain ways.  Section 4(b) contained a coverage formula—a laundry list of different criteria based off statistics and determinations made about states and political subdivisions from the 1960's and 70's.[2]  *Shelby County*, 570 U.S. at 551.  Section 4(b)'s coverage formula determined what jurisdictions were subject to regulation under § 5.  *Id.* at 550 ("The provisions of § 5 apply only to those jurisdictions singled out by § 4.").

Section 5 requires that, for "covered jurisdictions" under § 4(b), "no change in voting procedures c[an] take effect until it [is] approved by federal authorities in Washington, D.C.—either the Attorney General or a court of three judges."  *Id.* at 537.  A jurisdiction can obtain this "preclearance" only by demonstrating that the

---

[1] Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act, 120 Stat. 577 (2006).

[2] For example, § 4(b) covered "any State" or "political subdivision" that:

> the Attorney General determines maintained on November 1, 1964, any test or device [to impair minority voting rights], and . . . less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1964, or . . . less than 50 per centum of such persons voted in the presidential election of November 1964.

52 U.S.C. § 10303(b).

9

change neither has a "discriminatory purpose," nor "diminish[es] the ability of citizens, on account of race, color, or language minority status, 'to elect their preferred candidates of choice.'" *Id.* at 539 (quoting 52 U.S.C. § 10304).[3] This second requirement—that a voting procedure not have a discriminatory effect—incorporates a retrogression standard, meaning that changing a voting procedure violates § 5 only if it "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise" compared to the jurisdiction's previous election procedures. *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 478 (1997) (internal quotation marks omitted); *see also Georgia v. Ashcroft*, 539 U.S. 461, 477 (2003) ("[A] voting change with a discriminatory but nonretrogressive . . . effect does not violate § 5.").

If a covered jurisdiction does not obtain preclearance for a change to its voting procedures, § 5 prohibits that jurisdiction from "enact[ing] or seek[ing] to administer" the change. 52 U.S.C. § 10304(a). In other words, "changes in election practices are not 'effective as laws until and unless [they are] cleared pursuant to § 5.'" *McCain v. Lybrand*, 465 U.S. 236, 245 (1984) (quoting *Conner v. Waller*, 421 U.S. 656, 656 (1975)); *see also Clark v. Roemer*, 500 U.S. 646,

---

[3] At the time *Shelby County* was decided, sections 4 and 5 of the Voting Rights Act were codified at 42 U.S.C. § 1973b and § 1973c, respectively. They are now codified at 52 U.S.C. § 10303 and § 10304.

652–53 (1991) ("If voting changes subject to § 5 have not been precleared, § 5 plaintiffs are entitled to an injunction prohibiting the State from implementing the changes.").

Section 5's preclearance requirements and prohibitions are thus dependent on § 4(b)'s coverage formula. *Shelby County*, 570 U.S. at 550. Because § 5 only applies to the jurisdictions identified in § 4(b), it becomes toothless without it. *See id.* at 559 n.1 (Ginsburg, J., dissenting) ("[W]ithout [§ 4(b)'s] formula, § 5 is immobilized.").

> 2. *Shelby County* held § 4(b)'s coverage formula to be unconstitutional, rendering § 5 inapplicable

The Supreme Court held in *Shelby County* that § 4(b)'s coverage formula was unconstitutional. Under the Fifteenth Amendment, "a statute's 'current burdens' must be justified by 'current needs,' and any 'disparate geographic coverage' must be 'sufficiently related to the problem that it targets.'" *Shelby County*, 570 U.S. at 550–51 (quoting *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)). In *Shelby County*, the Court observed that, although § 4(b)'s coverage formula was constitutional when first passed in the 1960's, "[t]here is no denying . . . that the conditions that originally justified these measures no longer characterize voting in the covered jurisdictions." *Id.* at 535. Congress's failure to update the formula "ignore[d]" recent positive developments

11

in voting rights and instead "ke[pt] the focus on decades-old data relevant to decades-old problems, rather than current data reflecting current needs." *Id.* at 553. Thus, because § 4(b) triggered heavy preclearance burdens under § 5 based on forty-year old information that no longer reflected modern reality, the Court "declare[d] § 4(b) unconstitutional" and held that "[t]he formula in that section can no longer be used as a basis for subjecting jurisdictions to preclearance." *Id.* at 557.

Although the Court "issue[d] no holding on § 5 itself," *id.*, § 4(b)'s invalidation effectively brought § 5 down with it. Section 5's preclearance requirements no longer apply because, without § 4(b)'s coverage formula, there are no covered jurisdictions for § 5 to apply to. *See id.* at 559 n.1 (Ginsburg, J., dissenting) ("The Court purports to declare unconstitutional only the coverage formula set out in § 4(b). But without that formula, § 5 is immobilized." (citation omitted)); *Thompson v. Att'y Gen. of Miss.*, 129 F. Supp. 3d 430, 435 (S.D. Miss. 2015) (three-judge panel) ("[W]ithout a coverage formula, no jurisdictions are presently covered by § 5's preclearance requirement.").

Altogether, there are three takeaways from this examination of the Voting Rights Act and *Shelby County*. First, § 5 applies only to covered jurisdictions under § 4(b). Second, § 5 prohibits those jurisdictions from enacting or

administering changes in their voting procedures without first obtaining preclearance. Finally, after *Shelby County*, there are no covered jurisdictions under § 4(b), so § 5's prohibitions do not apply to any jurisdictions.

### B. Post-*Shelby County*, § 5 Does Not Prohibit Decatur from Implementing the 2010 Referendum

Putting these three takeaways together leads to one conclusion: § 5 does not prohibit or regulate any voting procedure changes after *Shelby County*. Although § 5 may have prohibited covered jurisdictions from altering their voting procedures without preclearance when § 4(b) was still in force, that is undeniably no longer the case after *Shelby County*. *Shelby County* "stop[ped] any application of § 5 by holding that § 4(b)'s coverage formula is unconstitutional." 570 U.S. at 587 (Ginsburg, J., dissenting). So, after *Shelby County*, formerly covered jurisdictions may alter their voting procedures without regard to § 5.

Indeed, § 5 places no limits on what laws noncovered jurisdictions may pass or enforce. Section 5 prevents only covered jurisdictions from enacting and administering changes to their voting procedures. 52 U.S.C. § 10304(a). It does not affect noncovered jurisdictions. *See Shelby County*, 570 U.S. at 550 ("The provisions of § 5 apply only to those jurisdictions singled out by § 4."). Further, the Act expressly allows covered jurisdictions to "bail out" of coverage. *See* 52 U.S.C. § 10303(a); *Nw. Austin*, 557 U.S. at 199 (describing the bailout

requirements). If a jurisdiction successfully bails out, then it is no longer a covered jurisdiction and thus no longer subject to § 5. At that point, the previously covered jurisdiction may enact or administer changes to its voting procedures regardless of what § 5 may have previously required. *See Nw. Austin*, 557 U.S. at 199, 205–06 (holding that constitutional questions about sections 4 and 5 could be avoided because a covered jurisdiction that bails out of coverage frees itself from the restrictions of sections 4 and 5). It logically follows that § 5 does not prohibit noncovered jurisdictions from enacting or administering laws, whether they are noncovered because *Shelby County* invalidated § 4(b)'s coverage formula, because they have bailed out, or because they were never covered to begin with.

As a result, § 5 is inapplicable to Decatur, a formerly covered jurisdiction, and does not prohibit Decatur from now altering its voting procedures. And that is precisely what Voketz seeks—purely prospective relief requiring Defendants to implement the 2010 referendum going forward. Because Decatur is no longer a covered jurisdiction under § 4(b)—and thus no longer subject to § 5—§ 5 does not currently prohibit Decatur from altering its voting procedures. Although § 5 may have prohibited implementing the referendum without preclearance when it was originally passed before *Shelby County* (an issue we do not address here), that plainly is not the case now that Decatur is no longer a covered jurisdiction. Thus,

§ 5 cannot prohibit any voting procedure change that Decatur makes now or in the future.

The only other court to consider this issue reached the same conclusion. In *Thompson v. Attorney General of Mississippi*, a three-judge panel denied a requested preliminary injunction based on a formerly-covered jurisdiction's alleged violation of § 5 after *Shelby County*. 129 F. Supp. 3d 430 (S.D. Miss. 2015). Similar to the facts here, *Thompson* concerned a Mississippi law that was passed in 1980 that the plaintiffs alleged could not be enforced after *Shelby County* because it never received preclearance. *Id.* at 435. The court observed that, although the law would have been unenforceable "before *Shelby County*," "[t]he result of *Shelby County* is that § 5 cannot be enforced at all." *Id.* Accordingly, the court denied the plaintiff's request for a preliminary injunction. *Id.* at 436. *Thompson*'s reasoning and holding that § 5 no longer prohibits changes to voting procedures—even for laws passed while § 5 was still applicable—agrees with our analysis and conclusion here.

Defendants' § 5 defense rests entirely on the premise that a law that was unenforceable under § 5 before *Shelby County* is unenforceable forever. Section 5, however, does not invalidate or nullify laws, nor does it mandate that they may never be administered. Instead, it prohibits covered jurisdictions from "enact[ing]

15

or seek[ing] to administer" voting procedure changes without preclearance. *See* 52 U.S.C. § 10304(a). Section 5 acts as an obstacle to the implementation of any changes until those changes are precleared. *See McCain*, 465 U.S. at 245; *Clark*, 500 U.S. at 652–53. Once a jurisdiction is removed from coverage and § 5 no longer applies, the obstacle is removed, and the jurisdiction may freely implement its desired changes.

Defendants concede as much. At oral argument, Defendants acknowledged that if this lawsuit were reversed—if Defendants had decided to implement the 2010 referendum and Voketz sued to stop it—§ 5 would pose no obstacle. Indeed, this is precisely what *Thompson* held. And we can see no reason why the outcome should be different here. Decatur was free the moment *Shelby County* was decided to either enact a new law duplicating the referendum or to simply administer the original. *See Thompson*, 129 F. Supp. 3d at 435 ("[F]ormerly covered states may now immediately 'enact or seek to administer' voting laws, practices, and procedures without having to await review by the Department of Justice." (footnote omitted)). Whether Defendants freely choose to implement the 2010 referendum or they are compelled to do so through this lawsuit, after *Shelby County*, neither violates § 5.

The district court got it right in its original order when it observed that Voketz was seeking "a prospective-only application of *Shelby County*" and denied Defendants' motion for summary judgment. The district court erred by later reversing itself and granting summary judgment to Defendants. In doing so, the district court did not explicitly address how § 5 could, post-*Shelby County*, prevent Defendants from implementing the 2010 referendum. Instead the court appears to have operated from the presumption that § 5 barred implementation unless *Shelby County* was retroactive. If Voketz was challenging pre-*Shelby County* actions based on Defendants' failure to implement the referendum, *Shelby County*'s retroactivity might be at issue. But this case does not concern retroactivity. Voketz seeks only prospective declaratory and injunctive relief that requires Decatur to implement the referendum going forward. *Shelby County* need not be retroactive for Voketz to be entitled to such relief.

## CONCLUSION

It may be that Section 2 of the Voting Rights Act, the Constitution, or state law could impose some obstacle that prevents Defendants from implementing the 2010 referendum now. We do not know the answer to that question. What we do

know is that Section 5 does not stand in the way.  The district court's order

granting summary judgment to Defendants is therefore **REVERSED**.[4]

---

[4] Because we reverse the district court's order granting summary judgment to Defendants, we do not address Voketz's alternative argument that the district court abused its discretion by limiting discovery.

**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

September 13, 2018

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 17-11941-BB
Case Style: Gary Voketz v. City of Decatur, Alabama, et al
District Court Docket No: 5:14-cv-00540-AKK

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against the appellees.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Carol R. Lewis, BB at (404) 335-6179.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna Clark
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs